UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SENTINEL INSURANCE COMPANY, LTD. | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 15 C 8612 |
| MICHAEL COGAN, JOHN POWER, GREG | ) | |
| MARSHALL, JON PAPIN, AND COGAN & | ) | |
| POWER, P.C., | ) | Judge Thomas M. Durkin |
| | ) | |
| DEFENDANTS | ) | |

**MEMORANDUM OPINION AND ORDER**

Sentinel Insurance Company, Ltd. ("Sentinel") filed this declaratory judgment action seeking a declaration of no duty to defend or indemnify Michael Cogan, John Power, Jon Papin, and Cogan & Power, P.C.[1] (collectively, the "Cogan Defendants") in their state court action (the "underlying suit") against the McNabola Law Group ("McNabola"). R. 1. Sentinel now moves for summary judgement. R. 21. For the reasons that follow, the motion is granted.

**Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Under Illinois law, the interpretation of an insurance policy is a

---

[1] The parties agree that Sentinel owes no duty to defend or indemnify Greg Marshall in the underlying suit. *See* R. 52 at 4 n.1.

1

question of law that is properly decided by way of summary judgment." *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818-19 (7th Cir. 2008).

## Background

On July 1, 2014, McNabola filed a lawsuit against the Cogan Defendants in DuPage County Court. R. 23 (Pl. SOF) ¶ 6. The original complaint in the underlying suit alleged seven claims arising from the departure of the Cogan Defendants from McNabola in 2011 and 2012, and their formation and administration of a competing law firm, Cogan & Power, P.C. ("the Cogan firm"). *Id.* ¶ 7.

In August 2014, just before the Cogan Defendants appeared and filed an answer in the underlying suit, Cogan attorney Jon Papin sent an email to the law clerk of a judge before whom McNabola had a pending case. *Id.* ¶¶ 8-9. Papin had worked extensively on the case prior to his departure from McNabola. *Id.* ¶ 9. The email alleged serious ethical and professional misconduct by a McNabola attorney. *Id.* It was sent from Papin's email account at the Cogan firm and suggested to the law clerk that his suspicions should be shared with the presiding judge. *Id.* Indeed they were, and the judge relayed the content of the email to the accused McNabola attorney in open court. R 1-3 ¶ 76. In September 2014, an attorney for McNabola sent the Cogan Defendants a letter demanding that they "immediately cease and desist from publishing false and defamatory statement[s] about [McNabola attorneys]," and warning that "the McNabola Law Group will take swift action to protect their legal rights." R. 23 ¶ 10.

As promised, in October 2014, McNabola amended its complaint against the Cogan Defendants to add two defamation claims based on the content of Papin's email. *Id.* ¶¶ 13-20. In support of those claims, they alleged that "Papin sent the email accusing [a McNabola attorney] of unethical behavior in his capacity as a partner, representative, employee, and agent of the Cogan Firm, and on behalf of the Cogan Firm . . . with the intention of harming [the McNabola attorney and firm] and benefitting himself and the Cogan Firm." R. 1-3 ¶ 110. The Cogan Defendants received notice of the amended complaint on October 30, 2014. *Id.* ¶ 21.

At that time, the Cogan firm was covered by a commercial general liability ("CGL") insurance policy issued by Sentinel (the "Sentinel Policy"). *Id.* ¶ 24. Subject to a number of exclusions, the Sentinel Policy covered "bodily injury" and "property damage" occurring on business premises as well as "personal and advertising injury" arising from the business of the firm. *Id.* ¶¶ 26-29. The "personal and advertising injury" provision covered, among other claims, those arising from the "electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." R. 23 ¶ 26. The parties agree that the defamation claims potentially fall within the scope of this provision. *See* R. 22 at 2. However, this coverage is subject to a "professional services exclusion," which applies to any "'personal and advertising injury' arising out of the rendering of or failure to render professional services as a lawyer." R. 23 ¶ 27. The parties disagree as to whether this exclusion applies.

The Sentinel Policy requires the Cogan firm to promptly notify Sentinel of any duty it may have to defend and indemnify a claim for damages. Specifically, it requires notification "as soon as practicable" of any "offense which may result in a claim" or any "suit brought against any insured." *Id.* ¶ 28. In late June or early July 2015, nine-and-a-half months after the cease-and-desist letter was sent and eight months after the filing of the amended complaint, the Cogan Defendants put Sentinel on notice of the underlying suit. *Id.* ¶ 22; R. 44 (Def. Resp. to SOF) ¶ 22. The parties disagree as to whether this delay in tender was reasonable under the circumstances.

**Discussion**

As alluded to above, Sentinel makes two arguments in support of its motion for summary judgement. First, it argues it has no duty to defend because coverage for Papin's conduct is carved out by the Sentinel Policy's professional services exclusion. Second, Sentinel argues that even if the professional services exclusion does not apply, the Cogan Defendants failed without justification to give timely notice of the claims against them. The Cogan Defendants respond that the professional services exclusion should be read narrowly and construed against Sentinel, and that notice was reasonably delayed given their confusion over the scope of the Sentinel Policy's coverage. The Court addresses each argument in turn.

A.     The Professional Services Exclusion

To determine whether an insurer has a duty to defend or indemnify,[2] courts are to compare the allegations in the underlying complaint to the relevant coverage provisions of the insurance policy. *See Hurst-Rosche Engineers, Inc. v. Comm. Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995). When making this comparison, courts "must focus on the allegedly tortious conduct on which the lawsuit is based." *Id.* A duty to defend is triggered if the underlying complaint contains allegations that fall, or potentially fall, within the scope of coverage. *See St. Paul Fire & Marine Ins. Co. v. Vill. of Franklin Park*, 523 F.3d 754, 756 (7th Cir. 2008) (citing authority). "The insurer may properly refuse to defend its insured only if it is clear from the face of the complaint that the wrongdoing alleged is not covered under the policy." *Hurst-Rosche*, 51 F.3d at 1342.

The parties dispute whether the professional services exclusion applies to Papin's email. The exclusion carves out coverage for all personal and advertising injuries "arising out of the rendering of or failure to render professional services as a lawyer." R. 23 ¶ 27. Thus, whether Sentinel has a duty to defend depends on whether Papin was rendering professional services as a lawyer when he sent the email. The Policy does not define the term "professional services." It is left to the Court, therefore, to construe its meaning.

---

[2]     The duty to defend is broader than the duty to indemnify. Accordingly, a finding of no duty to defend necessarily precludes a finding of a duty to indemnify. *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 693 (7th Cir. 2009).

5

"A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy." *BASF AG*, 522 F.3d at 819 (quoting authority). "In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased . . . and the overall purpose of the contract." *Id*. Where the terms of an insurance policy are clear and unambiguous, they must be applied as written; but where ambiguity exists, the terms will be strictly construed against the drafter. *Id*. "[T]he mere fact that a term is not defined does not render it ambiguous." *Nat'l Ben Franklin Ins. Co. of Ill. v. Calumet Testing Servs., Inc.*, 191 F.3d 456, at *4 (7th Cir. May 11, 1999) (unpublished opinion). Ambiguity only exists where a provision is susceptible of more than one interpretation and "reasonably intelligent persons would honestly differ as to its meaning." *Id*. (quoting authority).

The Sentinel Policy covers commercial liability. There is a well-recognized distinction between CGL policies like the one at issue here, and errors and omissions ("E&O") policies covering professional malpractice liability—particularly as such policies apply to lawyers. *See Nat'l Ben Franklin*, 191 F.3d 456, at *9. As Sentinel explains, "The professional services exclusion in Sentinel's commercial general liability insurance policy demonstrates that it is not a professional liability insurance policy, which is a separate line of coverage." R. 22 at 5. There is no question that the Cogan Defendants understood this distinction—they carried

6

separate E&O coverage through the Illinois State Bar Association Mutual Company ("ISBA Mutual"). R. 43 at 8.[3]

Sentinel argues that the professional services exclusion applies because "Papin spoke as a lawyer" when he communicated his professional opinion to the court regarding pending litigation in which he was previously involved as an attorney. *See* R. 22 at 6; R. 52 at 6-7. The Cogan Defendants do not dispute this characterization of Papin's conduct. Indeed, they concede that Papin "was acting as an officer of the court consistent with his belief that he had an ethical obligation to point out what he viewed as improper conduct." R. 43 at 4. The Cogan Defendants contend, however, that because Papin was not representing a client when he sent the allegedly defamatory email, he was not "rendering a professional service" within the meaning of the exclusion.

Illinois courts have consistently held that in the context of insurance agreements for lawyers, the term "professional services," without any modifying language, refers to "the practice of law." *See Cont'l Cas. Co. v. Cuda*, 715 N.E.2d 663, 668 (Ill. Ct. App. 1999) (citing authority); *accord Ill. State Bar Ass'n Mut. Ins. Co. v. Coleman Law Firm*, 2014 WL 7446203, at *11 (Ill. Ct. App. Dec. 29, 2014) (unpublished opinion). The practice of law encompasses a broad range of services

---

[3] The ISBA policy covered any actual or alleged "negligent act, error, or omission in the rendering or failure to render professional services." R. 26 at 4. The ISBA policy defined professional services as "those rendered by the insured as a lawyer, including services, whether or not [for] (*sic*) a fee, as an administrator, arbitrator, conservator, executor, guardian, mediator, notary public, personal representative, real estate title insurance agent, receiver, trustee, or in any other similar fiduciary activity." *Id.* at 3.

such as representing clients in litigation, preparing papers necessary to bring about business transactions, drafting trusts, wills and other estate-planning documents, and advising clients regarding compliance with the law. *See* "Practice of Law," Black's Law Dictionary (10th ed. 2014); *see also United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003) (quoting *People v. Peters*, 141 N.E.2d 9, 11 (Ill. 1957)) ("[T]he practice of law involves not only [the] appearance in court in connection with litigation, but also services rendered out of court and includes the giving of advice or the rendering of any service requiring the use of any legal skill or knowledge, such as preparing a will, contract or other instrument, the legal effect of which, under the facts and conditions involved, must be carefully determined."). "That the practice of law involves service to another seems axiomatic." *Mendelsohn v. CNA Ins. Co.*, 451 N.E.2d 919, 922 (Ill. Ct. App. 1983).[4]

---

[4] There is one case that casts some doubt on this axiom. In *Westport Ins. Corp. v. Jackson*, 2005 WL 2300358 (M.D. Penn. Aug. 19, 2005), the court considered whether an insured lawyer was "practicing law" when he responded to an inquiry from another attorney on a bar association listserv. *Id.* at *4-*6. The response set forth the insured lawyer's opinion regarding the competency of a particular expert witness service, and suggested a deposition strategy designed to expose allegedly dishonest aspects of the service's opinion-rendering process. The professional liability policy in *Jackson* covered injuries arising from "the rendition of legal services for others . . . in the insured's capacity as a lawyer . . . and arising out of the conduct of the insured's profession as a lawyer . . . [and] *as a member, director or officer of any bar association . . .*" *Id.* at *2 (emphasis added). In finding that the attorney's conduct fell within the scope of coverage, the court explained that "[b]ecause reasonable minds could differ as to whether defendant's . . . actions amounted to the rendering of 'legal services,' under common contract principles, the contract must be construed in favor of the defendants and against [the insurer]." *Id.* at *6. If the exclusion in the Sentinel Policy specifically carved out a lawyer's activities outside the attorney-client relationship as did the coverage provision in *Jackson*, the Court would give more weight to the reasoning in that case, which mirrors Sentinel's logic here. Instead, the Court takes the majority view, not

8

The most frequently cited cases on this issue reflect the wisdom of this axiom. *See Gould & Ratner v. Vigilant Ins. Company*, 782 N.E.2d 749, 751-52 (Ill. Ct. App. 2002) (holding that a third-party's claim arising from a lawyer's response to discovery requests on behalf of his client falls within the professional services exclusion); *Vogelsang v. Allstate Ins. Co.*, 46 F. Supp. 2d 1319, 1321-23 (S.D. Fla. 1999) (holding that the exclusion applies to an ex-husband's claim for damages arising from an allegedly defamatory document appended to the divorce petition filed by his ex-wife's lawyer on her behalf); *cf. Cont'l Cas. Co. v. Donald T. Bertucci, Ltd.*, 926 N.E.2d 833, 842-43 (Ill. App. Ct. 2010) (holding that a lawsuit alleging improper retention of settlement proceeds as fees did not allege "an act or omission in the performance of legal services," but rather an improper business practice undertaken by a lawyer in the administration of his firm). The question is not simply whether Papin was acting as a lawyer went he sent the email, but rather whether he was practicing law in service of another in doing so. *See Bertucci*, 926 N.E.2d at 843 ("When determining whether a particular act is a professional service, the court must not look to the title or character of the party performing the act, but the act itself.") (internal quotation marks and citation omitted).

Reporting suspected attorney misconduct is a professional duty; it does not "involve[ ] service to another." It is true that Papin's email contained information he allegedly obtained while practicing law. It is also true that in conveying his concerns to the court, Papin called upon his specialized knowledge and training as a

---

inconsistent with *Jackson*, that absent any specification to the contrary, the phrase "professional services as a lawyer" refers to the practice of law in service of another.

9

lawyer. But a service to the profession is not the same as a professional service. Construing the exclusion in favor of the insured as the Court must, the Court concludes it does not preclude coverage here.

B.   The Notice Provision

The Court therefore turns its attention to Sentinel's second argument—that the Cogan Defendants forfeited coverage by waiting eight months to provide notice of the underlying suit. An insurance policy's notice conditions impose valid prerequisites to coverage. *Westfield Ins. Co. v. Pugh*, 127 F. Supp. 3d 913, 916 (N.D. Ill. 2015) (citing *Country Mut. Ins. Co. v. Livorsi Marine, Inc.,* 856 N.E.2d 338, 343 (Ill. 2006)). Thus, "[a]n insured's breach of a notice clause in an insurance policy by failing to give reasonable notice will defeat the right of the insured to recover under the policy." *W. Am. Ins. Co. v. Yorkville Nat'l Bank*, 939 N.E.2d 288, 293 (Ill. 2010).

Whether notice was given within a reasonable time depends on the facts and circumstances of each case. *Pugh*, 127 F. Supp. 3d at 916. When the material facts and circumstances are not in dispute, courts may decide the issue of reasonableness as a matter of law. *Phila. Indem. Ins. Co. v. 1801 W. Irving Park, LLC*, 2012 WL 3482260, at *6 (N.D. Ill. Aug. 13, 2008) (citing authority). There is no precise timeframe in which notice is considered categorically reasonable or unreasonable. *Compare City of Chi. v. St. Paul Fire & Marine Ins. Co.*, 1998 WL 171787, at *4 (N.D. Ill. Apr. 10, 1988) (finding six to seven month delay unreasonable as a matter of law where insured failed to promptly locate applicable policies), *with OneBeacon Ins. Co. v. U.S. Foods, Inc.*, 304 F.R.D. 536, 540 (N.D. Ill. 2014) (finding a question

of fact as to whether three year delay was reasonable where the date on which the underlying claim arose was contested, and the resolution of that contest implicated an insurer other than the one to whom the suit was originally tendered). Indeed, "a lengthy delay in providing notice is not an absolute bar to coverage provided the insured's reason for the delay is justifiable under the circumstances." *Yorkville*, 939 N.E.2d at 294.

To determine whether the time between the occurrence or suit and notification was reasonable, courts consider five factors: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of the event that may trigger coverage; (4) the insured's diligence in ascertaining whether coverage is available; and (5) prejudice to the insurer. *See id.* Each factor is relevant to, but not individually determinative of the question of reasonableness. *See id.* The prejudice factor is only relevant if the insured's actions were otherwise reasonable. *Livorsi*, 856 N.E.2d at 346 ("[O]nce it is determined that the insured did not receive reasonable notice, the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer.").

### 1. *Language of the Notice Provision*

The Sentinel Policy requires notification of any "occurrence or offense which may result in a claim" or any "suit brought against any insured" "as soon as practicable." R. 23 ¶ 26 (internal punctuation omitted). Under Illinois law, "[a] policy condition requiring 'notice as soon as practicable' is interpreted to mean

'within a reasonable time.'" *Livorsi,* 856 N.E.2d at 343 (citation omitted). Where, as here, the specific language of the notice provision does not identify a particular timeframe, the other factors weigh more heavily in the reasonableness analysis. *See Yorkville*, 939 N.E.2d at 294.

Still, when analyzing an identical notice provision, a court in this district recently emphasized the absoluteness of the language: "There is no qualification or condition: if [occurrence or] suit, then notice." *AU Elec., Inc. v. Harleysville Grp., Inc.*, 82 F. Supp. 3d 805, 815 (N.D. Ill. 2015). Explaining that the policy "categorically required . . . written notice of the claim or suit as soon as practicable," the court found a seven month delay in tendering notice from the time of filing unreasonable under the contract as a matter of law. *Id.* Another court considering a similar provision focused its analysis on the definition of the word "practicable," which Merriam Webster defines as "capable of being put into practice or of being done or accomplished." *See Hartford Cas. Ins. Co. v. ContextMedia, Inc.*, 65 F.Supp.3d 570, 579 (N.D. Ill. 2014) (citing Merriam-Webster.com). Applying that definition, the court found a lengthy delay unreasonable where the insured was not incapable of immediately notifying its insurer of a potential claim. *Id.* To the extent this factor impacts the Court's analysis, it weighs in Sentinel's favor.

### 2. *The Cogan Defendants' Awareness of the Triggering Event*

Sentinel argues that the notice obligation was triggered by the receipt of the cease-and-desist letter on September 11, 2014. R. 22 at 9. The Cogan Defendants respond that the letter did not make them aware of a possible claim because "it

would be reasonably assumed that so long as Cogan and Power did not make any further allegedly defamatory statements . . . the cease-and-desist letter would be the end of it." R. 43 at 7. This is a strained reading of the letter, at best. Other courts have found similarly-worded cease-and-desist letters to constitute triggering events. *See, e.g., ContextMedia*, 65 F. Supp. 3d at 579-80 (holding that the notice requirement was triggered when the insured received a cease-and-desist letter "specif[ying] that [the writing party] already had suffered 'material damages' and . . . was prepared to 'protect its rights to the fullest extent of the law'").

Even if the Court were to give credence to the argument, however, the Cogan Defendants concede that their contractual duty to notify Sentinel was triggered some six weeks later on October 30, 2014, when the amended complaint was filed. Whether the trigger date was September 11, 2014 or October 30, 2014 is immaterial. Sentinel was not given notice until late June or early July 2015,[5] between eight and nine-and-a-half months later. Meanwhile, the Cogan Defendants tendered notice to ISBA Mutual, their E&O carrier, on October 31, 2014, the day after the amended complaint was filed. R. 43-1 (Affidavit of Michael Cogan) ¶ 1. In the weeks and months thereafter, they also tendered notice to two other insurance providers they believed might have had an obligation to provide coverage. R. 43-1 ¶¶ 3-4. These prompt tenders suggest that the Cogan Defendants recognized the categorical nature of their notice obligation to their insurers. The Court echoes

---

[5] According to Sentinel, notice was tendered on July 1, 2015. R. 22 ¶ 22. According the Cogan Defendants, notice was given the week before, on June 25, 2015. The Court does not consider this seven-day difference material.

Sentinel's inquiry: "Why didn't they also notify Sentinel at that time?" R. 52 at 10. This factor, too, weighs in Sentinel's favor.

### 3. *The Cogan Defendants' Sophistication*

The Cogan Defendants explain that they simply did not know the Sentinel Policy covered defamation claims until they were educated by a consulting attorney on the details of insurance coverage law. R. 43-1 ¶¶ 7-11; *see also* R. 43 at 8. In defense of their ignorance, they state that "Cogan and Power, like most insureds under general liability policies, think of those policies as providing coverage if someone slipped and fell in the lobby." *Id.* Nearly conceding too much, they argue that "[i]t was reasonable . . . to think that because a lawyer wrote a letter to a judge regarding another lawyer that it would be a professional services claim and not one also covered under a general liability policy." *Id.* They explain, "It [was] only when the details of the policy and the case law . . . were studied that the insureds were informed that, in fact, their general liability policy does provide coverage for this claim." *Id.* at 8-9.

The glaring problem with this defense is that as lawyers, the Cogan Defendants are in the business of studying contracts and case law, and they provide no excuse for why they (or their litigation counsel) waited eight months (or required an expert) to do so here. Lawyers are routinely found to be sophisticated in commercial and insurance matters simply by virtue of their profession. *See N. Ins. Co. of N.Y. v. City of Chi.*, 759 N.E.2d 144, 150 (Ill. Ct. App. 2001) ("The City [of Chicago] . . . possessing its own in-house legal department, is hardly

14

unsophisticated in commercial and insurance matters."); *AU Elec., Inc.*, 82 F. Supp. 3d at 815 ("AU's representation by counsel gave it sophistication in commerce and insurance matters."); *see also MHM Servs., Inc. v. Assurance Co. of Am.*, 975 N.E.2d 1139, 1159 (Ill. App. Ct. 2012) (noting that because insured had a full-time general counsel and local litigation counsel, it was sophisticated in commerce and insurance). The Cogan Defendants are no exception. Had they simply read the Sentinel Policy, they would have seen the unambiguous language of the "Personal and Advertising Injury" provisions. To the extent they were confused about the scope of those provisions or the application of the professional services exclusion, they, along with their litigation counsel retained to defend the underlying suit, had access to all of the resources, tools and information they needed to learn how those provisions are construed under Illinois law. The third factor thus also weighs against a finding of reasonableness.

*4. The Cogan Defendants' Diligence*

"[A]n insured's reasonable belief of noncoverage under a policy may be an acceptable excuse for the failure to give timely notice, even where the delay is lengthy." *OneBeacon*, 304 F.R.D. at 540 (citation omitted) (holding that a corporation's reasonable belief that an underlying suit was covered by a different insurance policy, could, under some circumstances, excuse late notice to the proper insurer); *see also Pugh*, 127 F. Supp. 3d at 917 (collecting cases where lengthy delays in notice were excused by the ignorance of individual policy holders regarding obscure coverage provisions); *Yorkville*, 939 N.E.2d at 295-96 (finding a

15

late tender of written notice justifiable when the insurer had been given timely oral notice of the suit and had informed the insured (incorrectly) that the policy did not cover the claim). Still, no matter the circumstances, "[t]he insured is expected to act with due diligence when its policy requires it to give notice of a suit to the insurer." *N. Ins. Co. of N.Y. v. City of Chi.*, 759 N.E.2d at 149; *see also ContextMedia*, 65 F. Supp. 3d at 585 ("an insured's belief of non-coverage under a policy cannot be an acceptable excuse if the insured did not act as a reasonably prudent person would in determining if the occurrence or lawsuit was covered by the policy") (internal quotation marks and citation omitted). "Absent a valid excuse, the insured's failure to satisfy the notice requirement will generally absolve the insurer of its duties under the policy." *Northbrook*, 729 N.E.2d at 915.

The Court finds that Cogan Defendants were not diligent. Their delay was a consequence of assuming non-coverage and waiting eight months to obtain an expert to probe that assumption. This is not a valid excuse. Similar conduct has been deemed unreasonable as a matter of law. *See Amerisure Ins. Co. v. Laserage Tech. Corp.*, 2 F. Supp. 2d 296, 305 (W.D.N.Y. 1998) (applying Illinois law) (entering summary judgment for the insurer when "the sole reason the defendants failed to give notice [for eight-months post suit] was that they did not think their [CGL] policies provided coverage [for patent suits]" and where counsel "admitted that after reviewing the [underlying] complaint, it was not a 'difficult analysis' to determine that the insurers should be notified"); *accord Northbrook*, 729 N.E.2d at 467-68 ("A reasonable insured's attorney would have examined the complaint and relevant

16

policy provisions to gauge the applicability of coverage rather than 'assuming' . . . that coverage was excluded. A reasonable insured additionally would not have simply concluded that the advertising injury coverage was uncomprehensible [sic] . . . [but] easily could have conferred with someone knowledgeable in the subject within a reasonable time period."); *see also MHM Servs.*, 975 N.E.2d at 852 (finding delay in tender unreasonable where "timing reveals that this insured did not bother to read the complaint and its insurance contract together"). The Cogan Defendants did not act as reasonably prudent lawyers in casting the Sentinel Policy aside.

The Cogan Defendants attempt to distinguish themselves from other insureds courts have found failed to exercise due diligence. They explain that once the amended complaint was filed, they "did not sit idly by," but rather tendered notice to three other insurers, and after receiving denials from each, retained a specialist to help them determine where (if anywhere) coverage for the underlying suit fell. R. 43 at 8. This may be so, but it does not explain why they never read the Sentinel Policy against the allegations in the amended complaint when it was filed, or why they waited eight months to engage someone else to do so. If they had acted diligently, they would have been learned that their assumption that CGL policies apply only to slip-and-falls was incorrect. Particularly in light of the Cogan Defendants sophistication, the Court does not consider their inaction justifiable.

    4.    *Prejudice to Sentinel*

"[O]nce it is determined that the insurer did not receive reasonable notice of an occurrence or lawsuit, the policyholder may not recover under the policy,

regardless of whether the lack of reasonable notice prejudiced the insurer." *Livorsi*, 856 N.E.2d at 346 (explaining the *Simmon* Rule); *accord ContextMedia*, 65 F. Supp. 3d at 583-84 ("lack of prejudice is not a condition which will dispense with the requirement of reasonable notice"); *1801 W. Irving Park*, 2012 WL 3482260, at *9 ("the absence of prejudice alone is insufficient to render [the insured]'s actions 'reasonable'"). The question of prejudice is irrelevant here.[6]

**Conclusion**

As sophisticated lawyers, the Cogan Defendant's failure to examine the terms of the Sentinel Policy against the allegations in the amended complaint for eight months is unreasonable as a matter of law. Because they breached the notice provision of the Sentinel Policy by failing to notify Sentinel of the underlying suit as soon as practicable, Sentinel is relieved of its duty to defend and indemnify. Sentinel's motion for summary judgment, R. 21, is granted.

---

[6] The Cogan Defendants argue that Sentinel has suffered no prejudice in the eight months since the defamation claims were filed because the key evidence related to the claims—the Papin email—is safely preserved, and because no discovery has taken place on the defamation claims. R. 43 at 9. This argument, even if it were relevant, misses the mark. If the defamation claims bring the underlying suit within the scope of the Sentinel Policy, Sentinel would be obligated to defend the entire suit. *See Amerisure*, 2 F. Supp. 2d at 303 ("[I]f the underlying complaint alleges several theories of recovery against the insured, the insurer will have a duty to defend even if only one such theory is within the potential coverage of the policy."). Seven claims have been the subject of contentious litigation between McNabola and the Cogan Defendants since July 2014. Had notice been given promptly upon the filing of the amended complaint, Sentinel would have been only a few months behind in taking up the Cogan Defendants' defense. Since notice was delayed, however, Sentinel most certainly would have been prejudiced by coming into litigation already a year under way. *See id.* at 305.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: August 15, 2016